2019 IL App (4th) 150637-B

NO. 4-15-0637

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| NOBLE LEWIS, JR., | ) | No. 14CF88 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Holder White and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    In March 2015, the State charged defendant, Noble Lewis, Jr., with home invasion (720 ILCS 5/19-6 (West 2014)) and domestic battery (subsequent offense) (720 ILCS 5/12-3.2(a)(2) (West 2014)). In April 2015, a jury found defendant guilty of domestic battery but not guilty of home invasion.  The trial court later sentenced him to five years in prison.

¶ 2    Defendant appealed, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred because, when the deliberating jury requested to hear again the compact disc recording of the victim's 911 call, the court had the jury brought into the courtroom where the compact disc was replayed in the presence of the court, both counsel, and the defendant; (3) his trial counsel rendered ineffective assistance of counsel; and (4) this court should vacate the purported fines imposed by the circuit clerk but not imposed by the judge.

¶ 3        In *People v. Lewis*, 2018 IL App (4th) 150637, this court rejected defendant's first three arguments but agreed with his fourth. Accordingly, we vacated the clerk-imposed fines, and we otherwise affirmed the trial court's judgment.

¶ 4        Defendant filed a petition for leave to appeal with the Supreme Court of Illinois. In September 2018, the supreme court denied defendant's petition but entered the following supervisory order:

> "In the exercise of this Court's supervisory authority, the Appellate Court, Fourth District, is directed to vacate its judgment in *People v. Lewis*, case No. 4-15-0637 (04/13/18). The appellate court is directed to consider the effect of this Court's opinion in *People v. Vara*, 2018 IL 121823, on the issue of whether it has jurisdiction to address and vacate the clerk-imposed fines in this matter." *People v. Lewis,* No. 123582 (Ill. September 26, 2018) (supervisory order).

¶ 5        In accordance with the supreme court's direction, we vacate our earlier opinion in this case, filed April 13, 2018. Further, after considering the effect of the supreme court's opinion in *Vara* on the issue of whether this court has jurisdiction to address and vacate the clerk-imposed fines in this matter, we conclude that we do not. Accordingly, we adhere to and reinstate our prior opinion in this case in all respects except regarding the matter of clerk-imposed fines. We conclude, in light of the supreme court's decision in *Vara*, 2018 IL 121823, ¶ 23, that we lack jurisdiction to review the clerk-imposed fines in this case that were not included as a part of the trial court's final judgment. Thus, we decline to address this issue.

¶ 6                                I. BACKGROUND

¶ 7        Defendant's jury trial occurred in April 2015, and the following facts are undisputed.

¶ 8		From about 9:30 to 11 a.m. on February 28, 2014, defendant's then-girlfriend, Kelly Glore, had coffee in Danville, Illinois, with a friend, Glen Fink. At the time, defendant, a mechanic by trade, was working on a car and drove it to Auto Zone to buy some parts. While there, he received a telephone call from Glore, who wanted him to pick her and Fink up from K-Mart because it was too cold for them to wait for the bus. Defendant did so, dropped Fink off at his destination, and dropped Glore at her apartment on Fairweight Avenue. Defendant then resumed work on the car.

¶ 9		At 4:30 or 5 p.m., he finished with the car and arrived at Glore's apartment around 5:30 p.m. He cooked supper, which he and Glore ate while drinking vodka. Around 7 or 8 p.m., a man whom defendant knew, Michael Roberson, arrived at the apartment, and defendant introduced him to Glore.

¶ 10		At this point, the accounts from Glore and defendant as to what happened substantially differ.

¶ 11		A. The State's Case in Chief

¶ 12		1. *The Testimony of Kelly Glore*

¶ 13		Glore testified that when Roberson came over, he and defendant smoked crack cocaine. As she was lying on a mattress in the living room, Roberson looked over at her and asked, " 'Ma'am, which room do I get?' " Thinking he was just talking nonsense because he was high, she at first ignored him. When he repeated the question, she responded, " 'What do you mean, which room do you get?' " He explained he had paid defendant $50 to live in her apartment.

¶ 14   Upon receiving this news, Glore asked defendant to come with her to the bedroom so she could talk with him. During their conversation in the bedroom, she told defendant "he needed to leave and sober up for a couple of hours." The prosecutor asked her:

> "Q. What happened?
>
> A. At that point, I saw a look in his eyes, and I got scared and ran outside. I ran to the apartment steps, ran to the side of the apartment, and I called the police, and then I ran back up the steps and ran toward my apartment, and [defendant] was going to throw me over the balcony, so I braced myself between the balcony and the girl's apartment door[,] and that's when he was punching me in the head and face."

¶ 15   After defendant "let [her] up," she went back into her apartment. Both he and Roberson had "[taken] off." Defendant "probably realized that [she had] called the cops."

¶ 16   The police arrived at her apartment, and she told them what had happened. The police looked for defendant but could not find him. They told her to call them back if he returned.

¶ 17   About 2 a.m., defendant kicked in the door of her apartment. When he did so, she was lying on the mattress in her living room and had not left the apartment since the police had been there. She explained what happened next, as follows:

> "At first, he came after me with a staple gun. Then he grabbed a kitchen chair and put a hole in the wall, broke the kitchen chair, and then he put a mask on his face, and I asked [him] why he was putting the mask on his face, and he said so that way when he kills me, we [*sic*] couldn't identify him. Then he put some gloves on, and I asked him why he put the gloves on. He said because that way

they won't get any fingerprints from him. He had two knives in his hand[,] and he came to the mattress and jumped on top of me and told me he was going to kill me. First, he wanted to get the phone, but I had the phone stuffed under the mattress in my hand, and—when he had the knives to my neck, I told him—I took the [B]ible out to him, and then he got up, but it was God that called 911, because I couldn't see what I was calling. And then the police came in."

¶ 18    On cross-examination, Glore denied she smoked crack cocaine with Roberson when he came to her apartment with defendant, but she admitted smoking crack cocaine three months before the trial. She remembered going to the police station and giving a statement to a detective named Lewallen, but because "[it had] been a long time [ago]," she could not remember everything she had told him. She remembered telling him about the staple gun. However, she could not remember whether she told the detective that defendant had been living with her on Fairweight Avenue or that he had hit her eight times.

¶ 19    She agreed with defense counsel that this was "not the first time [she had] called the police on [defendant]," but she could not remember the date when she previously had done so. She and defendant had known each other for only a year prior to the trial. A previous battery occurred sometime when they lived together on Main Street before she moved to Fairweight Avenue. She had defendant arrested for domestic battery on that previous occasion, and "[h]e spent some time in jail." When he was released from jail, she allowed him to move back in with her on Main Street because she loved him.

¶ 20    2. *The Recording of Glore's First 911 Call*

¶ 21    The first 911 call that Glore made in the early morning of March 1, 2014, lasted 5 minutes and 20 seconds. The State played a compact disc, on which the call was recorded. In the

911 call, Glore, wailing and sobbing, identified her attacker as "Noble Lewis, Jr." She stated that he had left after punching her, she currently was alone in the apartment, and this was not the first time he beat her up.

¶ 22                                    3. *The Testimony of Kyle Harrold*

¶ 23         Kyle Harrold testified he was a Danville police officer. On March 1, 2014, around midnight, he received a dispatch to Fairweight Avenue regarding a domestic-battery call. When he arrived at the apartment, the door frame was intact, and there were no obvious marks on the door. Inside, it was a "pretty standard apartment," with "nothing really out of place."

¶ 24         The prosecutor asked Harrold:

"Q. Could you please describe your own personal [observations] of what Kelly Gore looked like at that time?

A. At that time, she had swelling, some bruising and redness in the right corner of her right eye. She also had redness in her left ear."

¶ 25         After talking with Glore, Harrold attempted to locate the suspect but was unsuccessful. He told Glore to call back if the suspect returned to the apartment, and the police would come as fast as they could.

¶ 26         At about 2:15 a.m. on March 1, 2014, the dispatchers received a hang-up 911 call. They looked up the telephone number and discovered it was Glore's.

¶ 27         In response to the hang-up 911 call, Harrold returned to apartment No. 6 on Fairweight Avenue. As Harrold got out of his squad car, "a male black who was later identified as [defendant]" was on a porch. (In the courtroom, Harrold identified defendant as the man.) Upon seeing Harrold, defendant "ran back into the apartment." Harrold ran after him and up some stairs. When Harrold reached Glore's apartment, he found (1) the door of the apartment

partly ajar, (2) a large mark, seemingly a shoe print, on the center left of the door, by the door handle, and (3) the door frame broken, with splinters of wood on the floor. Glore yelled, " ['C]ome in and get him[!'] " On Harrold's instructions, she ran out of the apartment, and defendant came into the living room. Harrold then arrested him.

¶ 28                    4. *The Testimony of Danielle Lewallen*

¶ 29         Danielle Lewallen testified she was a Danville police officer currently assigned to the second-shift patrol, but in March 2014 she was assigned to the detective division. (She explained that patrol officers in the Danville police department normally were rotated into the detective division, where they remained for a year and then were rotated out again.)

¶ 30         On March 1, 2014, at about 2 a.m., the dispatcher notified her of a hang-up 911 call. The 911 call history indicated an address on East Main Street, and at first Lewallen went to that address, but nothing appeared to have happened there. Harrold then informed Lewallen that only a few hours earlier he handled a domestic call on Fairweight Avenue, at apartment No. 6, Glore's apartment. So, Lewallen and Harrold went to that address.

¶ 31         Upon arriving, they found the door of the apartment busted in and a shoe print on the door. Two people were in the apartment, defendant and Glore. The interior of the apartment was in disarray, things were strewn around, and a chair and a lamp were broken. Lewallen photographed a kitchen knife that Harrold told her allegedly had been used against Glore. Lewallen did not recall seeing a staple gun.

¶ 32         She photographed injuries to Glore's face, neck, and left ear. Glore was upset. She said it was her apartment and that defendant stayed there every night.

¶ 33         The prosecutor asked Lewallen:

"Q. *** Defense counsel asked you about Ms. Glore making comments that she had smoked crack that—on—about the time this happened. Did she indicate to you what time of day that she had smoked crack?

* * *

A. She advised she went for coffee that morning, and after she went for coffee, she had smoked some crack, and that [defendant] had smoked crack with her, and he had continued to smoke crack throughout the day.

Q. Did she indicate if she stopped smoking crack at any point during that day?

A. She didn't advise that she had smoked any crack after the initial time she advised. I do not recall the initial time."

¶ 34                                   B. Defendant's Case

¶ 35                            1. *The Testimony of Defendant*

¶ 36        Defendant took the stand in his own behalf. He testified that he and Glore began dating one another in February 2013 and that, at some point, he moved in with her on East Main Street. Her electricity and water had been turned off for nonpayment, and he assisted her financially by putting the utilities in his own name. He "help[ed] her *** get her life together," and, according to him, "[s]he liked that in [him]."

¶ 37        On August 30, 2013, while they were living together on East Main Street, Glore asked defendant to give her some money, and he refused. In retaliation, she accused him of battering her, even though he "never put a hand on her." He returned to the house in the evening after working on a car, and he tried to get in the back door, but she had blocked it with a refrigerator, and she ran out the front door.

¶ 38 The police arrested him and took him to jail, where he remained until October 8, 2013. On that date—even though he was innocent—he pleaded guilty to simple battery so he could get out of jail in time for Thanksgiving and Christmas. (Later, on cross-examination, he admitted he was convicted in 2013 of domestic battery.) He had children, and it was important to him to be with them during the holidays.

¶ 39 In 2013, while defendant was in jail, Glore visited him and promised "she would try to do better." He was "kind-hearted," and he "cared for her" and did not want to see her homeless. So, when he was released from jail, he reestablished his relationship with her and helped her move from the East Main Street residence, from which she was being evicted, to the apartment on Fairweight Avenue. He moved in with her again.

¶ 40 Defendant testified that on February 28, 2014, when defendant went to Auto Zone to buy parts, Glore telephoned him and asked him to come to K-Mart to give her and Fink a ride. Defendant then picked them up in the car he was working on. He dropped Fink "off at Valleyview" and Glore at the apartment on Fairweight Avenue, and he resumed work on the car.

¶ 41 Defense counsel asked defendant:

"Q. I'm going to back you up a little bit. You picked them up. Where did you pick them up?

A. By K-Mart.

Q. Did something happen while Ms. Glore was getting in the car?

A. Yeah. She was in such a hurry to get in the car when the door opened, she got in, but she bumped her head both times getting in. It was a small car. Trying to get in as fast as she was getting in, she didn't get in all the way. She

crashed with the door. I didn't see if she was okay. She got in, [']I'm okay. I'm okay.[']

    Q. Is that your understanding that's how she has the bump on the side of her head?

    A. Yes."

¶ 42    Around 4:30 or 5 p.m. on February 28, 2014, defendant finished working on the car, and its owner dropped him off at the apartment on Fairweight Avenue. Only Glore was there. He cooked dinner for the two of them. Defense counsel asked him:

    "Q. Did [Glore] eat dinner that night?

    A. She nitpicked at it, but I kind of knew why she nitpicked.

    Q. Why is that?

    A. She's been getting high.

    Q. Is that normal for her to do?

    A. She does it every day. But like I said, it's just every day.

    Q. When she's high, she doesn't eat much?

    A. No."

¶ 43    Around 7 or 8 p.m., Roberson came to the apartment. Defendant introduced him to Glore and had a drink with him, and Roberson and Glore talked. "Next thing you know, they found out that they do the same thing," that is, "[t]hey party alike." Roberson bought $20 of crack cocaine (from whom is unspecified), and he and Glore shared it while defendant washed dishes. Then they all "sat and talked and talked, kicking it, you know." Then Roberson bought another $20 of crack cocaine, and "they got that." By 12:30 or 1 a.m. on March 1, 2014, "[Glore]

wanted some more, and [Roberson] wanted some more, but all [Roberson] had was $10," and no dealer would take the risk of bringing a mere "$10 worth of stuff." Defendant continued:

"Me and [Roberson] left together, because the party was over with. They couldn't get no more stuff. So, okay. I said well—then she had a thing about I'm always doing that. That's when I told her, 'You supposed to be trying to quit this stuff. I'm doing what I'm trying to do, but you getting mad because he only got $10 left.' So, I don't understand. But anyway, I'm going to get some tobacco before the store closes."

¶ 44    So, around 1 or 1:15 a.m., defendant left the apartment with Roberson and set out on foot for Main Package on East Main Street to buy tobacco. The store's closing time was 2 or 2:30 a.m., and, "[o]n a good day," it was a 25-minute walk to the store, one way. It was cold and slippery out. Defense counsel asked defendant:

"Q. Okay. Did you take your billfold with you?

A. No. I left my billfold, my cell phone[,] and the house key in the dresser, because I was just running down the street. Ain't thinking about—I had the money in my pocket. I didn't have to grab none of that stuff. I never thought, you know, I would have no trouble getting in. I never had trouble getting in before, unless she lost her key. Well, she did lose her key."

¶ 45    After buying a bag of tobacco at Main Package, defendant walked back to the apartment on Fairweight Avenue. He estimated it was "probably about an hour, roundtrip," and he arrived back at the apartment "around probably 2:15 [a.m.], maybe." He knocked on the door of the apartment and yelled at Glore to unlock the door, but there was no response. "[K]nowing that when she's been on a binge like that, she can go to sleep and can't wake up," he "just had to

push the door open." The door had "been jimmied before, so it wasn't hard to do." He found Glore lying on the mattress in the living room. She appeared to have just awakened, and she looked stunned and baffled, as if she did not know what he was doing.

¶ 46        Defense counsel asked defendant:

"Q. Where did you go next?

A. I went to the kitchen to hang my coat up and took off everything. I was telling her, I said the door was locked. I had to jimmy it. So, you know, I get ready to start picking up the pieces. That's when I looked out the door and seen the police was coming up. I looked out the door and asked her why she called the police. She never said nothing. All I know then, they was just wanting to get me down. I told them I couldn't get down. I was trying to explain to them, I got 13 pins and stuff in my leg, so I can't get down."

¶ 47        Defendant denied ever hitting Glore or holding a knife or staple gun to her throat. He also denied kicking the door of her apartment. He insisted he was incapable of kicking and that, instead, he merely pushed the door open with his shoulder.

¶ 48                                2. *The Testimony of Norman Lewis*

¶ 49        Norman Lewis testified he was defendant's brother and that defendant and Glore had been in a dating relationship for "[r]oughly two years." He helped them move appliances to the house on East Main Street and, later, to the apartment on Fairweight Avenue. He had been to the apartment on Fairweight Avenue once or twice to pick them up and give them a ride. It was his understanding that defendant lived in the apartment with Glore, just as he had lived with her on East Main Street. He opined that the exterior of the apartment needed repairs, particularly the door. He testified: "The door, the steps all the way up to the apartment, was kind of rugged. The

door, you had to twist the knob, pick it up, try to bump it open, and you have to do the same thing when you shut it." The door "wasn't that secure."

¶ 50                                     3. *The Testimony of Kyle Harrold*

¶ 51          Defense counsel asked Harrold:

> "Q. [On March 1, 2014, at the Fairweight Avenue apartment,] [w]hen you spoke with Kelly Glore, did she tell you that there was a staple gun that was used?
>
> A. No, she did not.
>
> Q. Did she tell you that there was one knife or two knives?
>
> A. One knife."

¶ 52                                     C. The State's Case in Rebuttal

¶ 53                                     1. *The Testimony of Danielle Lewallen*

¶ 54          The prosecutor asked Lewallen about her interview of defendant on March 3, 2014, at the county jail. Specifically, the prosecutor asked her what he said "in regards to how he got inside of the apartment at Fairweight [Avenue] on the night that he was arrested." Lewallen answered:

> "A. He stated to me in the statement that Ms. Gore would not let him back into the residence, so he kicked the door in."

¶ 55                                     D. Notes From the Jury During Deliberations

¶ 56                                     1. *The Note Asking What Is a "Place of Residence"*

¶ 57          At 10:07 a.m. on April 22, 2015, the jury began its deliberations.

¶ 58          At 11:01 a.m., the jury sent out a note asking, "What constitutes your place of residence?" The trial court wrote in response: "You have the jury instructions." (The court had instructed the jury that knowingly and without authority entering the dwelling place of another

was an element of home invasion and that a "dwelling place" was "a building or portion of a building which [was] used or intended for the use as a human habitation, home, or residence.")

¶ 59        *2. The Note Requesting To Listen to the 911 Recording Again*

¶ 60        At 11:34 a.m., the jury sent out a note asking, "Can we have the 911 CD for us to listen to, tape player as well? Juror Lamar Reed."

¶ 61        Defense counsel asked the prosecutor if not only the first 911 call but also the second one were on the compact disc (People's exhibit No. 2). The prosecutor believed they were. The trial court asked: "What was the second one? Just a hang-up?" Defense counsel answered, "It's, like, a minute of background stuff."

¶ 62        The prosecutor was of the view that because he had not played the second (hang-up) 911 call to the jury, "it would be inappropriate for them to hear that" now. He argued, therefore, that if the court, in its discretion, allowed the jury to hear the first 911 call again, the jury should do so in the courtroom "so we can control them not hearing the second call." The court asked: "So, you want to bring them out here so they can hear it?" Defense counsel responded: "I think that's probably safest." Defense counsel then asked the prosecutor if possibly someone in his office "could just burn the first call." The prosecutor responded: "I'd rather not tamper with evidence." The following discussion occurred:

> "THE COURT: We're not going to do that. We're back on the record. Do you want me to go back and tell them that we're bringing them into the courtroom to listen to it, or do you want to just bring them in, or—
>
> MS. PERRY [(prosecutor)]: Whatever the [c]ourt—
>
> MS. BEZNER [(defense counsel)]: I would say to just bring them in.

MS. PERRY: I would say bring them in, Judge, and maybe admonish them out here that for legal reasons, we can't allow you to take it back into the jury room, but you can listen to it out here."

¶ 63　At 11:40 a.m., the jury was brought back into the courtroom. The trial court told the jury the following:

"THE COURT: For legal reasons, I can't send the tape player and the disc back to you in the jury room, but we're going to let you listen to it again out here. Okay.

MR. PERRY: For the record, I'm playing the disc.

(PEOPLE'S EXHIBIT [NO.] 2 PLAYED FOR THE JURY)

THE COURT: Okay. You can take them back in the jury room.

(JURY RELEASED BACK TO THE JURY ROOM

TO DELIBERATE AT 11:46 A.M.)"

¶ 64　Thereafter, the jury found defendant guilty of domestic battery but not guilty of home invasion.

¶ 65　II. ANALYSIS

¶ 66　Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred because, when the deliberating jury requested to hear again the compact disc recording of the victim's 911 call, the court had the jury brought into the courtroom where the compact disc was replayed in the presence of the court, both counsel, and the defendant, (3) his trial counsel rendered ineffective assistance of counsel, and (4) this court should vacate the purported fines imposed by the circuit clerk but not imposed by the judge. We will address these contentions in turn.

¶ 67                    A. The Sufficiency of the Evidence

¶ 68          In the domestic battery count (720 ILCS 5/12-3.2(a)(2) (West 2014)), the State

charged that on or about March 1, 2014, defendant knowingly and without legal justification

made physical contact of an insulting or provoking nature with Glore, a household or family

member, and that he committed this domestic battery after having previously been convicted of

domestic battery. Defendant argues that the State failed to prove him guilty beyond a reasonable

doubt because (1) Glore was impeached by inconsistencies between her 911 call and her trial

testimony and (2) Glore's testimony had no support in the physical evidence. We will first

address the alleged inconsistencies.

¶ 69                    1. *Inconsistencies Between Glore's 911 Call*
                         *and Her Trial Testimony*

¶ 70          Defendant argues that in her 911 call, Glore "clearly stated that she was currently

alone in the apartment," whereas she testified at trial that she made the 911 call while defendant

and Roberson were still in the apartment. (According to her testimony, defendant and Roberson

had "[taken] off" because defendant "probably realized that [she had] called the cops.")

However, this supposed inconsistency is explainable because Glore might have dialed 911 while

defendant and Roberson were still in the apartment, and they might have left as she was making

the call, thus leading her to tell the 911 operator she now was alone in the apartment. We note

that the 911 call literally begins with Glore's yelling, "Fuck you!"—as if at defendant's

departing back—and when the 911 operator first asks Glore where defendant is, she seems to

answer, "At the door." (Glore is sobbing and wailing and breathing heavily throughout the

recording, and understanding her is at times difficult.)

¶ 71          Later in the call, Glore seems ambivalent as to where defendant is. For instance,

she says she has not opened the door (presumably, the door to the apartment) and thus she does

not know if he is still there. Only later in the call can she confidently answer that she is alone in the apartment, and she suggests that defendant probably is running down an alley. Therefore, when we look at the evidence in the light most favorable to the prosecution, as we are required (see *People v. Hall*, 194 Ill. 2d 305, 330 (2000)), the supposed inconsistency does not necessarily exist.

¶ 72    Defendant contends a further inconsistency exists in that, in the 911 call, Glore reported that defendant already had punched her. However, in her trial testimony, she stated she made the 911 call out of fear that he would punch her and that he punched her after she made the 911 call.

¶ 73    Despite this inconsistency, when looking at all the evidence in the light most favorable to the prosecution, we are not convinced that all reasonable triers of fact consequently would find Glore to be unbelievable as a result. We acknowledge, of course, that testimony can be so pervasively inconsistent and so wildly implausible that no sensible trier of fact could possibly believe it. *People v. Smith*, 185 Ill. 2d 532, 541-45 (1999); *People v. Williams*, 65 Ill. 2d 258, 266 (1976); *People v. Williams*, 383 Ill. App. 3d 596, 643 (2008). However, putting Glore's testimony in that category would be a gross exaggeration. A witness need not be ideal to be believed. "Inconsistencies in and contradictions of testimony do not destroy credibility as a matter of law. [Citation.] Rather, the credibility of witnesses and the weight to be given their testimony are for the jury to decide." *People v. Vazquez*, 194 Ill. App. 3d 516, 518 (1990).

¶ 74            2. *The Lack of Physical Evidence to Substantiate*
                *Certain Parts of Glore's Testimony*

¶ 75    Defendant points out that although Glore testified he "came after [her] with a staple gun," the police found no staple gun on the scene. Defendant also argues that although Glore testified he held two knives to her neck and although a kitchen knife was located in the

- 17 -

apartment, no evidence was offered, beyond her testimony, that he really attacked her with a knife. The photographs showed no knife injury to her neck.

¶ 76 Again, these apparent discrepancies in the evidence are not, as a matter of law, dispositive. See *People v. Bowen*, 289 Ill. App. 3d 378, 384 (1997). Defendant might have put away the staple gun when he realized the police were on the way, and he could have held a knife to Glore's neck without cutting her with it.

¶ 77 Alternatively, the jury might have regarded these discrepancies as genuine but insufficient to make Glore unbelievable when it came to the beating she said she received from defendant. After all, she sounds quite hysterical and distraught in the 911 call, and the State presented photographs of her battered face.

¶ 78 Further, defendant's explanation for how she received the facial injuries, *i.e.*, accidentally running headlong into the door frame of the car—twice, no less—when he picked her up at K-Mart, is arguably so implausible as to lead to the inferences that (1) defendant deliberately lied in this respect and (2) his reason for lying was that he was in fact the one who inflicted the facial injuries on Glore. The jury might also have found defendant's story implausible when he claimed he walked an hour on a cold, icy night at 1 a.m. to buy tobacco or that he nonaggressively pushed the door of Glore's apartment open with his shoulder instead of kicking it in, as he originally told the police at the county jail. The jury may well—and justifiably—have regarded his implausible stories as circumstantial evidence of guilt. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 113 ("Moreover, defendant's lies are evidence of his consciousness of guilt").

¶ 79 In sum, when we look at all the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could find defendant guilty beyond a reasonable

doubt. *Hall*, 194 Ill. 2d at 330. In so concluding, we note that a reviewing court generally will not substitute it judgment for that of the trier of fact when the trier of fact determines the credibility of the witnesses, the weight to be given to their testimony, and the inferences drawn from the evidence.  *People v. Bradford*, 2016 IL 118674, ¶ 12.  A reviewing court will reverse a conviction only where the evidence is so improbable and unsatisfactory it creates a reasonable doubt as to defendant's guilt.  *Id.*

¶ 80                              B. Replaying the 911 Recording to the Jury
                                   in the Courtroom During Deliberations

¶ 81                                     1. *Invited Error*

¶ 82         Next, defendant argues that the trial court committed reversible error by replaying the 911 recording (People's exhibit No. 2) to the jury in the courtroom in the presence of the parties during deliberations. Assuming, for the sake of argument, that this was indeed an error (an assumption with which we disagree, as we soon will explain), defendant, through his defense counsel, invited the supposed error by affirmatively agreeing with the prosecutor's suggestion that the jury be brought back into the courtroom to hear the replaying of the 911 recording. See *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 26 ("For the doctrine [of invited error] to apply, the defendant must affirmatively request or agree to proceed in a certain way.") Defendant "invited or agreed to the procedure and is now estopped from asserting it as error." *People v. Bowman*, 221 Ill. App. 3d 663, 666 (1991).

¶ 83         Defendant disputes the fairness of the invited-error doctrine in this situation because the prosecutor and the trial court declined defense counsel's suggestion of recording the 911 call on another compact disc from which the second (unadmitted) 911 call would be excluded. Even so, however, defense counsel did not *need* to agree to a replay of the 911 recording (People's exhibit No. 2) in the courtroom. Alternatively, defense counsel could have

- 19 -

argued for sending the exhibit and a CD player to the jury room with instructions to listen to only the first 911 call. A jury is presumed to follow instructions. *People v. Pulliam*, 206 Ill. 2d 218, 256 (2002). Or defense counsel could have argued against allowing the jury to hear the 911 recording again, either in the jury room or the courtroom. See *People v. McDonald*, 329 Ill. App. 3d 938, 947 (2002) ("The decision whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court."); *People v. Panzer*, 73 Ill. App. 3d 1, 8-9 (1979) (to avoid undue emphasis on a single item of evidence, the trial court was justified in refusing to allow the defendant's written statement to go to the jury room). In other words, by rejecting, as impractical or too risky, defense counsel's suggestion of copying the first 911 recording onto another CD while somehow avoiding copying the second 911 recording, the prosecutor and the court did not really reduce defense counsel to only one potential position.

¶ 84        We point out that defendant's posttrial motion did not raise the alleged error of replaying the 911 recording to the jury in the courtroom during its deliberations. A defendant must both (1) object at trial to an alleged error and (2) raise the alleged error in his posttrial motion. A defendant's failure to do either means that the alleged error is forfeited for purposes an appeal. See *People v. Reese*, 2017 IL 120011, ¶ 60; *People v. Williams*, 2017 IL App (1st) 142733, ¶ 46. An exception to this rule applies if a defendant asserts that the error involved is so egregious that plain-error analysis should apply, thereby overcoming the defendant's forfeiture. However, under the circumstances of this case—specifically, defense counsel's acquiescence in the very trial court ruling he now wishes to challenge—defendant is barred from asserting that the plain-error doctrine applies. We reiterate what this court wrote in *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12, as follows:

"We also note that plain-error analysis does not apply to this case. Plain-error analysis, of course, 'applies to cases involving procedural default ***, not affirmative acquiescence.' *Bowens*, 407 Ill. App. 3d at 1101, 943 N.E.2d at 1258. When, as here, defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack. *Id*."

In fact, defendant does allege that his trial counsel was ineffective regarding the replaying of the 911 recording, an allegation we address later in this opinion.

¶ 85                                2. *Defendant's Claim of Structural Error*

¶ 86        Defendant argues it was a structural error to influence the jury's deliberations by bringing the jury back into the courtroom for the replaying of the 911 recording. Because structural errors require "automatic reversal," whether a structural error was invited is irrelevant because reversal nevertheless would be "automatic" in order to preserve the integrity of the judicial process. *People v. Belknap*, 2014 IL 117094, ¶ 85. In support of this contention, defendant cites Justice Holdridge's dissent in *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 44 (Holdridge, J., dissenting).

¶ 87        For reasons we will explain, we conclude the trial court committed no error by replaying the 911 recording in the courtroom. In the absence of any error, no claim of structural error could be justified. (Even though we conclude that structural error is not present in this case, we note that the United States Supreme Court recently explained the "concept of structural error" in *Weaver v. Massachusetts*, 582 U.S. ___, 137 S.Ct. 1899, 1907-08 (2017), and we have doubts whether defendant's structural error claims could ever meet the standards the Court explained in its discussion of structural error.)

¶ 88    To put Justice Holdridge's dissent in context, we will discuss the facts in *McKinley*. The defendant in that case was charged with aggravated driving under the influence (aggravated DUI) (*McKinley*, 2017 IL App (3d) 140752, ¶ 3), and in its case in chief, the State played for the jury a video of the traffic stop (*id.* ¶¶ 8-9). During its deliberations, the jury sent out a request to watch the video again. *Id.* ¶ 11. The judge had the bailiff bring the jury back into the courtroom, and the judge told the jury that because " 'two courts call [were] in process,' " a substitute judge would be present in the courtroom while the video was being replayed. *Id.* Before the video was replayed, the judge instructed the jury: " 'No one will make any additional comments about the video, and there won't be any questioning of any of the attorneys or anything along those lines.' " *Id.* Defense counsel made no objection to these remarks. *Id.* The jury then watched the video in the presence of the substitute judge, the prosecutor, defense counsel, the defendant, and the bailiff. *Id.* Afterward, the jury found the defendant to be guilty of aggravated DUI. *Id.* ¶ 12.

¶ 89    On direct appeal, the defendant in *McKinley* argued the trial court had erred by allowing the jury, during its deliberations, to view the video in the courtroom instead of in the jury room. *Id.* ¶ 1. Justice Carter was the lead author in *McKinley*, and he along with Justice O'Brien concluded that no reversible error occurred. In reliance on *United States v. Olano*, 507 U.S. 725, 737-38 (1993), *People v. Johnson*, 2015 IL App (3d) 130610, and *People v. Rouse*, 2014 IL App (1st) 121462 (¶ 16), Justice Carter found neither of the alternative elements of plain error to have been met (*McKinley,* 2017 IL App (3d) 140752, ¶¶ 25-27). One of the alternative elements was that "a clear or obvious error [had] occurred and the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error[.]" (Internal quotation marks omitted.) *Id.* ¶ 25.

¶ 90        Justice Carter saw no abuse of discretion and, hence, no error (let alone plain error) in allowing the jury, during its deliberations, to view the video in the courtroom. *Id.* ¶ 23. No one spoke to the jury while the video was being replayed, and the record showed no prejudice to the defendant. *Id.* Justice Carter was unconvinced that the mere presence of the substitute judge, the prosecutor, defense counsel, the defendant, and the bailiff "affected the jury's ability to analyze the video." *Id.* Although he found that no prejudice and, thus, no error had been shown, Justice Carter cautioned "that the procedure utilized by the court in the instant case could have the potential of becoming problematic and possibly lead to prejudice in some cases." *Id.* However, in Justice Carter's view, even if this procedure were erroneous, the evidence was not closely balanced, and, therefore, the error would be harmless. *Id.* ¶ 26.

¶ 91        The second, alternative element of plain error (sometimes referred to as structural error) is that "a clear or obvious error occurred and that error [was] so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* ¶ 25. Justice Carter was unconvinced that "the circuit court's decision with regard to the video" was a "structural error" in that sense. *Id.* ¶ 27.

¶ 92        Justice O'Brien disagreed with Justice Carter about the absence of error (*Id.* ¶ 32), although she ultimately specially concurred because she concluded that the evidence was not closely balanced; accordingly, plain error did not apply (*Id.* ¶ 36) (O'Brien, J., specially concurring). She believed "it was error to allow anyone to be present with the jury when [it] viewed the video during [its] deliberations," even if the jurors said nothing to one another while viewing the video and even if no one said anything to the jurors. *Id.* ¶ 32 (O'Brien, J., specially

- 23 -

concurring). Silent deliberation, she reasoned, was nonetheless deliberation. She explained further, as follows:

> "While some may argue that jury deliberations constitute only the actual discussion of evidence and not its mere viewing, I believe this distinction is one without significance. The discussion of evidence is no different than the viewing of evidence, as both occur after the jury is ordered to deliberate, *i.e.*, jury deliberations. Thus, upon a jury being ordered to deliberate, the circuit court must ensure that said deliberations are entirely private. Requiring the jury, in the instant case, to view the video in the courtroom and in the presence of the parties was improper." *Id.* ¶ 35 (O'Brien, J., specially concurring).

¶ 93    Justice Holdridge, in his dissent, disagreed with Justice O'Brien that allowing a deliberating jury to see a video again in the courtroom was erroneous *per se*. *Id.* ¶ 39 (Holdridge, J., dissenting). He believed it was a structural error, however, to have the deliberating jury view the video in the courtroom in conjunction with the instruction the trial court gave, that " '[n]o one [was to] make any additional comments about the video[.]' " *Id.* ¶¶ 43-44 (Holdridge, J., dissenting). Justice Holdridge wrote the following:

> "After hearing the instruction, it is reasonable to assume that the jurors would not have known if they were allowed to discuss the video among themselves once they returned to the jury room. I believe this fact, when viewed in conjunction with the fact that the jury was removed from the deliberation room and required to view the videotape in the courtroom and in the presence of the judge, parties, and bailiff, supports the conclusion that the circuit court abused its discretion in the manner in which it allowed the jury to review the videotape. Stated another way,

while a circuit court has the inherent authority to control its courtroom, such authority does not excuse conduct that results in the chilling of jury deliberations." *Id.* ¶ 41 (Holdridge, J., dissenting).

¶ 94        Thus, although Justice Holdridge agreed with Justices Carter and O'Brien that the evidence was not closely balanced, he argued that prejudice should be presumed from the conjunction of what he viewed as the erroneous instruction and the presence of the outsiders in the courtroom. He wrote that "[t]hough we cannot be certain that [the instruction] prevented the jury from discussing the video once [the jury] returned to the jury room, we can presume *** that the instruction inhibited the jury's ability to deliberate." *Id.* ¶ 43 (Holdridge, J., dissenting).

¶ 95        With all due respect to our distinguished Third District colleagues, we disagree with all of the views they expressed in *McKinley*. We recently rejected the argument that allowing a jury to view a video in the courtroom during deliberations amounted to a structural error, and we adhere to that view. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 43. We wrote that "even if we agreed with [the] defendant that the trial court erred in allowing the jury to view the video in the courtroom during deliberations, we find the alleged error does not rise to the level of structural error under the plain-error doctrine." *Id.*

¶ 96                      3. *Suggested Procedures When Replaying a
                           Recording to a Deliberating Jury*

¶ 97        To be clear, we now reject outright the argument that this procedure is even erroneous, let alone structurally erroneous. If a deliberating jury requests to hear an audio-recording or to see a video-recording again, the trial court does not have to send the recording and equipment to the jury room but may instead exercise its discretion to bring the jury into the courtroom for a replaying of the recording. See *State v. Davidson*, 509 S.W.3d 156, 203 (Tenn. 2016) (surveying numerous cases from other jurisdictions, all of which "found no abuse of

discretion by the trial court in allowing the jury to review or rehear recorded evidence in open court"); *State v. Hughes*, 691 S.E.2d 813, 826-27 (W. Va. 2010) (it is "universally accepted" that a trial court may allow the jury, during deliberations, to return to open court to review a tape recording admitted in evidence). Allowing a deliberating jury to listen to a recording again in the courtroom instead of in the jury room avoids problems with equipment and the skills necessary to operate the equipment (*State v. Jones*, 102 A.3d 694, 702 (Conn. 2014)) and also "minimizes the risk of breakage or erasure of the recording" (*State v. Anderson*, 717 N.W.2d 74, 84 (Wis. 2006)).

¶ 98       When a deliberating jury returns to the courtroom and, in the presence of the judge, the parties, the lawyers, and court personnel listens again, in silence, to an audio recording, the jury does nothing different from what it did before, when the recording originally was played. Assuming the trial court has properly instructed the jury regarding this procedure, we adhere to the majority view and reject the notion that replaying an audio or visual recording is improper.

¶ 99       Accordingly, we conclude that if a jury, during its deliberations, requests to see or hear a recording again, the trial court need not send the recording and equipment into the jury room but instead may, in its discretion, have the jury brought back into the courtroom for a replaying of the recording. Justice Carter is correct that "the mode and manner in which a circuit court allows a jury to review a piece of evidence" (in this case, the 911 recording) "falls directly within the scope of the court's inherent authority to manage its courtroom." *McKinley*, 2017 IL App (3d) 140752, ¶ 22. Thus, if the court chooses to have the recording replayed in the courtroom, the court, parties, and counsel must be present to view or hear the evidence, and the court should instruct the jury not to discuss the evidence while in the courtroom. The court

should also in the jury's presence admonish everyone else in the courtroom not to comment on the evidence, communicate with the jury, or try in any manner to influence the jury. See *Davidson*, 509 S.W.3d at 204. Further, to avoid the concerns expressed by Justice Holdridge in his dissent, the court should instruct the jury that after the replay, the jury will return to the jury room and should then continue its deliberations, which may include, if it wishes, the replay.

¶ 100    In the present case, the trial court did not give these instructions and admonitions, but "[in] the record before us, we find no indicia of prejudice or anything improper having occurred during the replay of the [recording]." *Rouse*, 2014 IL App (1st) 121462, ¶ 79.

¶ 101           C. Defendant's Claim of Ineffective Assistance of Counsel

¶ 102    Last, defendant argues his trial counsel rendered ineffective assistance by "not supporting her suggestion to burn the 911 call on another CD with constitutional and statutory law."

¶ 103    A claim of ineffective assistance has two elements: (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In evaluating a claim of ineffective assistance, we will not second-guess reasonable strategic decisions that counsel made at trial. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 125.

¶ 104    We deem counsel's agreement to replay the 911 recording in the courtroom in lieu of sending it to the jury room during deliberations to be a reasonable strategic decision. If the recording had gone back to the jury room (with a CD player), the jury could have played the recording over and over again in an attempt to ascertain everything Glore said to the 911 operator. (As we mentioned earlier, Glore was sobbing uncontrollably throughout most of the

recording.) In our opinion, no wise trial counsel would want the jury to listen to the 911 recording over and over again because doing so could be emotionally upsetting.

¶ 105 For instance, Glore in the recording says such things as (if we hear her correctly) "He's already on probation for battery for hitting me," and "He won't leave me alone. He keeps coming back," and "He's trying to kill me and make me have seizures." Absolutely nothing in this recording could have possibly benefited the defense, but, rather, from start to finish, this recording was damaging to the defense. (We are quick to add that despite this assessment, the admission of the recording was entirely appropriate. See *People v. Pelo*, 404 Ill. App. 3d 839, 867 (2010), where this court explained that evidence has an improper prejudicial effect only when the evidence in question "will somehow cast a negative light upon a defendant for reasons that have nothing to do with the case on trial." In other words, the jury would be deciding the case on an improper basis, such as sympathy, hatred, contempt, or horror. Clearly, the evidence at issue here had *everything* to do with the case on trial.)

¶ 106 For the reasons stated, we can readily understand why a reasonable defense counsel would gratefully embrace the suggestion that the jury hear the 911 recording replayed only once in the courtroom as opposed to who knows how many times in the jury room.

¶ 107 Accordingly, we find no deficient performance by trial counsel, and we reject defendant's claim of ineffective assistance.

¶ 108 D. Clerk-Imposed Fines

¶ 109 In the sentencing hearing and in its sentencing order, the trial court imposed no fines upon defendant. Even so, the circuit clerk listed several assessments, all of which this court has previously held to be fines. Defendant argues that because the imposition of these fines is exclusively a judicial act and because the circuit clerk is not a judge, the purported fines are void

- 28 -

and should be vacated.  However, as we earlier explained (see *supra* ¶ 5), we lack jurisdiction to review defendant's claim.

¶ 110                                      III. CONCLUSION

¶ 111          For the foregoing reasons, we affirm the trial court's judgment and assess $75 in costs against defendant (see 55 ILCS 5/4-2002 (West 2014)).

¶ 112          Affirmed.