2021 IL App (1st) 200421-U
Order filed: June 11, 2021

FIRST DISTRICT
FIFTH DIVISION

No. 1-20-0421

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 17 C6 60153 02 |
| | ) | |
| RUTH PERKINS, | ) | Honorable |
| | ) | Allen F. Murphy and |
| | ) | Patrick Coughlin, |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirmed defendant's conviction for retail theft and her sentence of 24 months' TASC probation, finding that the State proved her guilty beyond a reasonable doubt, that she forfeited her claim of sentencing error, and that defense counsel did not commit any ineffective assistance.

¶ 2    Following a bench trial, the circuit court convicted defendant, Ruth Perkins, of retail theft and sentenced her to 24 months of probation beginning on January 11, 2019, and terminating on January 10, 2021. Defendant filed a motion to reconsider her sentence and modify her probation

to allow her to participate in Treatment Alternatives for Safe Communities ("TASC") as a condition of her probation. The court granted defendant's motion to reconsider, vacated her sentence, and resentenced her to 24 months of TASC probation terminating on December 17, 2021. On appeal, defendant argues that: (1) the State failed to prove her guilty beyond a reasonable doubt; (2) the court erred by extending her probation termination date to December 17, 2021; and (3) her defense counsel provided ineffective assistance by failing to object to the extension of her probation termination date. We affirm.

¶ 3    The State charged defendant and co-defendant, Robert Boyd, with committing retail theft in a Home Depot, on February 14, 2017, by knowingly and intentionally transferring a Universal Product Code ("UPC") from a $44.97 space heater to a $1,483.97 generator so as to purchase the generator for less than its full retail value. Boyd pleaded guilty prior to trial and is not a party to this appeal.

¶ 4    At trial, Phillip Martin testified that, on February 14, 2017, he was working as a loss prevention agent at the Home Depot located at 20808 South Cicero in Matteson. His duties included enforcing company regulations and apprehending shoplifters. Martin dressed in plain clothes and split his time between monitoring surveillance cameras in a security office and walking the store.

¶ 5    At about 11 a.m., Martin was standing at the service desk in the Home Depot when he saw Boyd enter the store and select a shopping cart. Boyd pushed the shopping cart into the garden section and placed a Honda generator priced at $1,483.97 into the cart. Martin was about 15 or 20 feet away from Boyd at the time he put the generator into the cart.

¶ 6    Boyd then pushed the shopping cart three aisles over to the space heater aisle, selected a space heater priced at $44.97, and removed the UPC from the space heater. Martin explained that

-2-

a UPC is a code that is scanned at the cash register to identify the product's price, make, and model. While holding the UPC from the space heater in his right hand, Boyd pushed the shopping cart into Aisle 14 of the hardware department. Boyd left the cart in Aisle 14, exited the store at 11:03 a.m., and walked to a dark colored Jeep.

¶ 7      Boyd had a "quick conversation" with defendant, who was sitting in the Jeep with a baby. Defendant exited the Jeep, carrying the baby and a baby bag, and she and Boyd entered the Home Depot at 11:06 a.m. They went to Aisle 14, where Boyd retrieved the shopping cart containing the Honda generator and then they walked to the appliance area, which is a "blind spot" that is not captured by surveillance cameras. Martin was five feet away "on the other side of an aisle looking right at the two of [them]." There was nothing blocking his view of defendant and Boyd.

¶ 8      In the appliance area, Boyd handed defendant the UPC from the $44.97 space heater and then he walked to the end of the aisle and "looked around." Martin recognized that the UPC was the one Boyd had removed from the space heater because of its size and shape.

¶ 9      Defendant reached into the baby bag while holding the baby and took out a roll of clear packing tape. Defendant tore off a piece of tape and taped the UPC from the space heater over the Honda generator's UPC. Martin identified State's Exhibit 3 as a photograph of the Honda generator with the UPC from the space heater taped on it.

¶ 10      After defendant taped the UPC from the space heater over the Honda generator's UPC, she had a quick conversation with Boyd and then Boyd began pushing the shopping cart toward the front of the store. Along the way, Boyd selected a three-and-a-half-foot-long blind from a shelf and placed it into the cart. Boyd and defendant went to the self-checkout area. Martin followed them to the self-checkout area with his own shopping cart and pretended to check out.

¶ 11    At the self-checkout area, defendant selected two soft drinks, scanned them, and paid for them. Boyd then scanned the Honda generator (specifically, he scanned the UPC from the space heater which defendant had taped over the generator's UPC) which registered a price of $44.97. Boyd scanned the blind, decided that he did not want it, and gave it to a nearby store employee. Boyd then paid the $44.97 for the generator and he and defendant exited the store at 11:26 a.m.

¶ 12    Martin detained defendant and Boyd outside the Home Depot until Matteson Police Department officers arrived.

¶ 13    Officer Brown of the Matteson Police Department testified that shortly after 11 a.m., on February 14, 2017, he was called to the Home Depot located at 20808 South Cicero. When he arrived, Officer Brown saw defendant standing in back of the Jeep in the parking lot. Officer Brown had an "initial encounter" with defendant and went inside the store and spoke with Martin and another police officer. Officer Brown then returned to the Jeep to look for some clear box tape. Officer Brown looked inside the Jeep and saw a roll of clear packaging tape on the front seat, which he placed into evidence.

¶ 14    Defendant testified that on February 14, 2017, she and her boyfriend, Boyd, drove to the Home Depot store in Matteson. Defendant's four-and-a-half-month-old baby was with them. They arrived at around 11 a.m. and Boyd initially entered the store alone while defendant remained in the Jeep with her baby. Defendant was under the impression that Boyd needed to "buy a couple tools for his job."

¶ 15    After about 15 minutes, Boyd called defendant from the store and then returned to the Jeep. Defendant took her baby out of the car seat and went inside the store with Boyd so as to stretch her legs and look around. Defendant did not take any packing tape inside the Home Depot and Boyd never asked her to affix or tape a UPC to a box in his shopping cart. Defendant denied that

she ever transferred "any label" from one piece of merchandise to another while in the Home Depot. She bought a couple of beverages and returned to the Jeep and the loss prevention agent approached them.

¶ 16 The court admitted into evidence surveillance videos from four different cameras showing the Jeep in the parking lot, defendant and Boyd entering and exiting the store, and defendant and Boyd checking out in the self-checkout area.

¶ 17 Following all the evidence, the court convicted defendant of retail theft on an accountability theory, finding Martin's testimony to be credible and "rather compelling." On January 11, 2019, the court sentenced defendant to 24 months' probation with a termination date of January 10, 2021. Defendant filed a motion to reconsider sentence on February 8, 2019, arguing that the sentence was excessive and that the court improperly considered in aggravation matters that are inherent in the offense. At a hearing on the motion held on February 25, 2019, defense counsel clarified that he was asking the court to modify defendant's probation so as to allow her to participate in TASC. The matter was continued for a hearing on August 21, 2019, at which defendant was present. During the hearing, defense counsel indicated that he had only learned of defendant's substance abuse issues after her sentencing hearing and he reiterated:

"We [are] asking if the Court would consider allowing [defendant] to be evaluated and possibly be recommended for treatment through the TASC program through the adult probation department."

¶ 18 Defense counsel noted that if defendant successfully completed the TASC program, she would be eligible to move the court to vacate her conviction pursuant to section 40-10 (e) of the Substance Use Disorder Act (20 ILCS 301/40-10(e) (West 2019)), which states:

"Upon successful completion of the terms and conditions of probation [*i.e.*, completion of the TASC program] the court shall discharge the person from probation. If the person has not previously been convicted of any felony offense and has not previously been granted a vacation of judgment under this Section, upon motion, the court shall vacate the judgment of conviction and dismiss the criminal proceedings against him or her unless, having considered the nature and circumstances of the offense and the history, character and condition of the individual, the court finds that the motion should not be granted. Unless good cause is shown, such motion to vacate must be filed at any time from the date of the entry of the judgment to a date that is not more than 60 days after the discharge of the probation."

¶ 19    The court reviewed the transcript of the original sentencing hearing and determined that defendant had not previously asked for a TASC evaluation. The court stated:

"I will order a TASC evaluation and see what the findings of the TASC evaluation are, and I think I have to do that before making a determination of whether I'm going to modify the sentence to see what the TASC evaluation indicates.

I will point out that the defendant was given just a *** sentence of two years' probation with no conditions, and that was on January 11th. So if the court did vacate that sentence just as long as [defendant] knows she'd be resentenced to a term of up to the maximum sentence allowed for this offense, that is a possibility, and you have to complete all the terms of probation."

¶ 20    Defense counsel responded, "Yes, Judge."

¶ 21    The court then stated, "She may be going even longer. But I think we are getting ahead of ourselves. Let's see what TASC evaluation indicates."

¶ 22　Defendant underwent a TASC evaluation. On October 8, 2019, TASC informed the court of its finding that defendant met the diagnostic criteria for severe alcohol use disorder and moderate cannabis use disorder. TASC recommended intensive outpatient services.

¶ 23　At a hearing held on December 18, 2019, at which defendant was present, defense counsel noted the TASC finding and asked the court to reconsider defendant's sentence "to allow for the provision of TASC probation as opposed to just regular straight probation with whatever conditions that the court would deem appropriate."

¶ 24　The court stated:

"I reviewed the sentencing transcript ***. It does not appear that TASC was ever raised by the defense at that time. I had indicated to [defendant] that the sentence was all the way back on January 11th of 2019. She almost has a year of the 24 months' probation that she was originally sentenced to complete. She's set to term that probation on January 10th of 2021. But given the fact she is eligible for TASC, I don't see any other prohibition given the facts that were elicited at trial. *** If she wants it, I will go ahead and resentence her to 24 months of TASC probation."

¶ 25　Defense counsel responded, "Yes, Judge."

¶ 26　The court stated, "Then the original sentence will be vacated. The defendant will be sentenced to 24 months' TASC probation." The sentencing order provided that the TASC probation would terminate on December 17, 2021. Defendant did not file any motions related to the resentencing order.

¶ 27　On appeal, defendant first argues that the State failed to prove her guilty of retail theft beyond a reasonable doubt. When the sufficiency of the evidence is challenged on appeal, we must view all the evidence in the light most favorable to the State and determine whether any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 31. The trier of fact is in a better position than we are to assess witness credibility, determine the appropriate weight of the testimony, and resolve any conflicts and inconsistencies in the evidence, and we will not substitute our judgment therefor. *Id.*

¶ 28 A person commits retail theft when she knowingly:

"Alters, transfers, or removes any label, price tag, marking, indicia of value or any other markings which aid in determining value affixed to any merchandise displayed, held, stored or offered for sale in a retail mercantile establishment and attempts to purchase such merchandise at less than the full retail value with the intention of depriving the merchant of the full retail value of such merchandise." 720 ILCS 5/16-25(a)(2) (West 2016)

¶ 29 The court here convicted defendant of retail theft on an accountability theory.[1] A person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c)(West 2016). To prove defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either: (1) defendant shared the criminal intent of the principal or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common design rule, "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible

---

[1] Defendant questions whether she was convicted as a principle or on an accountability theory, but the trial court made clear during its oral judgment that "[t]he issue is whether the defendant is accountable for the actions of Mr. Boyd." The court found defendant to be accountable based on all the evidence at trial.

for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d 307, 337 (1995). "Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. In determining a defendant's legal accountability, the trier of fact may consider evidence that she was present during the perpetration of the offense, maintained a close affiliation with her companion after the commission of the crime, and failed to report the crime. *Cowart*, 2017 IL App (1st) 113085-B, ¶ 34.

¶ 30    Viewing the evidence in the light most favorable to the State, any rational trier of fact could find that defendant aided and abetted Boyd in the commission of retail theft by following him into the Home Depot after he had torn the UPC off of the space heater, and then retrieving packing tape from her baby bag and taping the UPC from the space heater over the UPC on the more expensive generator. Defendant's actions enabled Boyd to scan the UPC from the space heater at the self-checkout area and pay $44.97 for a generator priced at $1,483.97. Defendant maintained a close affiliation with Boyd during and after the crime, walking with him through the store after transferring the UPC from the space heater to the generator and entering the self-checkout area with him and exiting the store together, and she failed to report the crime. Their common criminal design may be inferred from all these circumstances and supports the trial court's finding of defendant's guilt on an accountability theory.

¶ 31    Defendant argues that since there was no surveillance video showing her taking the UPC from Boyd and taping it over the generator, the only such evidence came from Martin, whose testimony was "vague, implausible and internally inconsistent" and should not have been believed. Defendant recognizes that as the trier of fact, the trial court was in the best position to observe the conduct and demeanor of the witnesses, assess their credibility, and weigh the evidence (*Cowart*,

2017 IL App (1st) 113085-B, ¶ 31) but argues that where, as here, the conviction is based on improbable testimony contrary to human experience, we should not give deference thereto. *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). Defendant specifically questions Martin's testimony that he was "looking right at the two of [them]" at the time Boyd handed her the UPC from the space heater and she taped it onto the generator. Defendant contends Martin's testimony was improbable because Boyd, who was looking around the aisle, would not have missed seeing Martin watching them. However, Martin later explained in his testimony that he was watching them "through another aisle," meaning that he was hidden from Boyd's and defendant's view.

¶ 32    Defendant argues the improbability of Martin being able to identify the UPC which Boyd handed her as coming from the $44.97 space heater. Defendant characterizes the UPC as "quite small" and not readily identifiable as belonging to the space heater, but Martin explained that he was only five feet away from defendant and Boyd at the time she received the UPC from Boyd and transferred it to the generator and that:

> "I could see that it was a UPC with the swiggly lines. And I could see that it was just the torn off, same size, same shape [as the UPC torn from the space heater]."

¶ 33    Martin testified that the generator was recovered and he identified State's Exhibit 3 as a photograph of the generator with the UPC from the space heater attached thereto. Any issue regarding whether the UPC was the one from the space heater was answered when Boyd scanned it at the self-checkout area and it registered the $44.97 price for a space heater instead of the $1,483.97 price of a Honda generator.

¶ 34    Defendant also questions Martin's testimony that she ripped off a piece of packing tape and taped the UPC from the space heater onto the generator while still holding her baby. Defendant contends that Martin's testimony was "contrary to human experience", arguing:

"Ripping off a piece of packing tape to tape it onto a box requires some dexterity, particularly when one is moving quickly to avoid detection. Under those circumstances, it would make no sense for [defendant] to keep holding her very young baby in one arm. Rather, human experience suggests that she would have instead handed the baby to Boyd so she could complete her task efficiently."

¶ 35    Martin testified, though, that after giving defendant the UPC, Boyd walked to the end of the aisle to look around and thus he was not available to be handed the baby. Under such circumstances, defendant's taping the UPC onto the generator while holding her baby was not "contrary to human experience."

¶ 36    Finally, defendant generally contends that the court should have believed her testimony denying her involvement instead of Martin's testimony. Martin's testimony was unimpeached and corroborated in part by: (1) the recovery of the Honda generator with the UPC from the space heater attached to it; (2) the packaging tape recovered from defendant's Jeep; and (3) the surveillance video showing defendant and Boyd entering and exiting the store and checking out in the self-checkout area. The court found Martin to be a credible, even "compelling" witness and for all the reasons stated we will not substitute our judgment therefor. *Cowart*, 2017 IL App (1st) 113085-B, ¶ 31.

¶ 37    Next, defendant argues that the trial court erred when, in granting the motion to reconsider the sentence so as to allow her to participate in the TASC program as a condition of probation, it extended her probation termination date thereby lengthening the total amount of time she spends on probation. As discussed earlier in this order, the trial court originally sentenced defendant on January 11, 2019, to 24 months' probation ending on January 10, 2021, without any provision for TASC treatment. On December 18, 2019, the court granted defendant's motion to reconsider,

vacated the original sentence, and resentenced defendant to 24 months' TASC probation ending on December 17, 2021, without crediting her for the 11 months of probation which she had already served.

¶ 38   Defendant contends that in so doing, the court improperly increased her sentence in violation of section 5-4.5-50(d) of the Code. Section 5-4.5-50(d) states that "[t]he court may not increase a sentence once it is imposed." 730 ILCS 5/5-4.5-50(d) (West 2018). When a sentence has been vacated and defendant stands before the court for resentencing, the trial court may not deny credit for time served on probation since such a denial would result in an increased length of sentence. *People v. McBride*, 395 Ill. App. 3d 204, 210 (2009).

¶ 39   Defendant also argues that by sentencing her to 24 months' TASC probation on top of the 11 months of probation already served, the trial court has imposed a total of 35 months' probation for the offense of retail theft in violation of section 5-4.5-40(d) of the Code. Section 5-4.5-40(d) provides that the period of probation for a class 3 felony such as retail theft shall not exceed 30 months. 730 ILCS 5/5-4.5-40(d) (West 2018).

¶ 40   The court may extend the period of probation for a class 3 felony beyond 30 months "upon a violation of a condition of the probation." See section 5-6-2(e) of the Code (730 ILCS 5/5-6-2(e) (West 2018)). However, defendant is not alleged to have committed any probation violations and therefore she argues that section 5-6-2(e)'s exception to the 30-month limitation on the period of probation is inapplicable here.

¶ 41   Defendant failed to raise these arguments before the trial court and therefore forfeited the issue of the allegedly improper extension of her time on probation (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)) but seeks plain error review. Under the plain error rule, we may consider a forfeited claim when a clear or obvious error occurred and: (1) the evidence is so closely balanced

that the error alone threatened to tip the scales of justice against defendant, regardless of the seriousness of the error; or (2) the error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 16.

¶ 42     The State counters that plain error review is forfeited when, as here, defendant invited the error. *Id.* ¶ 17. Under the invited-error doctrine, defendant may not ask the trial court to proceed in one way and then contend on appeal that it was error to proceed that way. *People v. Gibson*, 2021 IL App (1st) 190137, ¶ 18. To allow defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play and encourage duplicitous behavior. *Id.* For the invited-error doctrine to apply, defendant must affirmatively request or agree to proceed in a certain way. *People v. Lewis*, 2019 IL App (4th) 150637-B, ¶ 82.

¶ 43     The invited-error doctrine applies here, as the court's resentencing order, including its extension of the termination date for defendant's term of TASC probation, was made at defendant's request and with her agreement. Specifically, defendant expressly requested that the trial court modify her original 24-month term of probation, which was set to end on January 10, 2021, so as to allow her to participate in TASC with the ultimate goal of successfully completing treatment and then moving to vacate her conviction. The court stated that it would order a TASC evaluation as long as defendant understood that the result of the evaluation could lead to the court vacating her original sentence and resentencing her to a new term of probation "up to the maximum sentence allowed for this offense" and that "She may be going even longer." Defendant agreed to the TASC evaluation.

¶ 44     After defendant underwent the TASC evaluation and was found to meet the diagnostic criteria for severe alcohol use disorder and moderate cannabis use disorder, TASC recommended

intensive outpatient services. The court subsequently held a hearing on December 18, 2019, during which it noted that under her original sentence, defendant's term of probation would conclude on January 10, 2021. The court stated that given the TASC findings, it would consider sentencing defendant to another 24 months of TASC probation starting from December 18, 2019, "if she wants it." Defendant again agreed and did not request that she be credited for the portion of the probation term already completed nor did she object to the vacatur of the prior sentence. In accordance with defendant's agreement, the court then vacated defendant's sentence and resentenced her to 24 months' TASC probation with a termination date of December 17, 2021.

¶ 45    To now allow defendant to use the ruling she procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play and violate the invited-error doctrine.

¶ 46    Defendant argues, though, that the invited-error doctrine does not apply where the trial court's agreed-upon ruling results in a statutorily unauthorized sentence. Defendant cites in support *People v. White*, 2011 IL 109616, which held that under the so-called "void sentencing rule," the trial court exceeds it authority by ordering a sentence greater than that which the statute mandates and that "[i]n such a case, the defendant's sentence is illegal and void." *Id.* A void order can be attacked at any time, even where defendant invited the error. See *People v. Smith*, 406 Ill. App. 3d 879, 887 (2010).

¶ 47    However, in *People v. Castleberry*, 2015 IL 116916, the supreme court abolished the void sentencing rule. *Castleberry* held that lack of personal or subject matter jurisdiction renders a judgment void but that the failure to comply with a statutory requirement merely renders the judgment voidable. A voidable judgment is not excepted from the invited-error doctrine. See generally *Smith*, 406 Ill. App. 3d at 887 (distinguishing between voidable judgments subject to the invited-error doctrine and void judgments that are not subject to the doctrine).

-14-

¶ 48    No argument is made here that the trial court lacked personal and subject matter jurisdiction in this case. As such, the court's alleged sentencing error in vacating defendant's original sentence of 24 months' probation terminating on January 10, 2021, and resentencing her to TASC probation terminating on December 17, 2021, was merely voidable and thus is not excepted from the invited-error doctrine. As defendant procured the order vacating her original sentence and resentencing her to 24 months' TASC probation with a termination date of December 17, 2021, she invited the alleged error and thus cannot seek plain error review. *Harding*, 2012 IL App (2d) 101011, ¶ 17.

¶ 49    Next, we address defendant's claim of ineffective assistance. To prevail on a claim of ineffective assistance of counsel, defendant must show that: (1) her counsel's performance was objectively unreasonable under prevailing professional norms; and (2) she was prejudiced thereby. *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 50    Defendant argues that her trial counsel provided ineffective assistance by failing to file a post-sentencing motion attacking the December 18, 2019, order that vacated her original 24-month term of probation and resentenced her to a new 24-month term of TASC probation ending on December 17, 2021, without crediting her for the 11 months of probation already served.

¶ 51    We find  no ineffective assistance. By convincing the court to vacate defendant's original sentence of 24 months' probation, which contained no provision for TASC treatment, and to resentence her to a new term of 24 months of TASC probation ending on December 17, 2021, counsel secured two significant benefits for defendant: (1) he procured treatment for her substance abuse issues; and (2) he provided a means for her to petition to vacate her conviction upon completion of the TASC program. Defendant contends that by failing to ask the court to reconsider the extension of her probation termination date to December 17, 2021, counsel inherently prejudiced her by causing her to serve an additional 11 months of probation resulting in

"limitations on her liberty." However, defendant does not specify the limitations to which she is referring or how they infringed on her liberty, nor does she argue how her increased length of time on probation outweighed the benefits of TASC treatment and the opportunity to vacate her conviction. Defendant's claim of ineffective assistance fails because she has not shown any deficient performance by her counsel.

¶ 52    Defendant's claim of ineffective assistance also fails for lack of prejudice. Defendant makes no argument and points to no evidence that she has completed the TASC program, meaning that even if counsel had procured TASC probation ending on the original termination date of January 10, 2021, her failure to have successfully completed TASC treatment would have rendered her ineligible on that date to have her TASC probation discharged and her conviction vacated. The new probation termination date of December 17, 2021, gives defendant additional time to complete the TASC program, receive a discharge from probation, and move to vacate the judgment of conviction, which was the object of her motion to reconsider sentence in the first instance. On this record, we cannot say defendant was prejudiced by such an extension of the probation termination date.

¶ 53    For all the foregoing reasons, we affirm the circuit court.

¶ 54    Affirmed.