2021 IL App (1st) 181621-U

No. 1-18-1621

Second Division
October 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| | ) | No. 13 CR 17436 |
| v. | ) ) | |
| ROMAN FOREMAN, | ) ) | Honorable Matthew E. Coghlan |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred.

**ORDER**

¶ 1    *Held*:  Defendant's conviction is affirmed where eyewitness testimony was sufficient to prove his guilt beyond a reasonable doubt. The trial court did not err in admitting other crimes evidence or in responding to the jury's questions during deliberations.

¶ 2     Following a jury trial, defendant Roman Foreman[1] was convicted of the first degree murder of Freddie Walton and sentenced to 60 years in prison. He now appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt where eyewitness accounts identifying him were unreliable, (2) the trial court erred in allowing the State to present other crimes evidence, and (3) jury questions sent during deliberations showed that the jury did not understand that he did not need to present evidence proving his innocence. We affirm.

¶ 3                           I. BACKGROUND

¶ 4                   A. Motion to Allow Other Crimes Evidence

¶ 5     In September 2013, defendant was indicted on multiple counts of first degree murder in connection with the shooting death of Freddie Walton, which occurred in May 2013. On September 29, 2015, the State filed a motion to admit other crimes evidence as probative of defendant's identity, absence of mistake, or *modus operandi*. In particular, the State sought to introduce evidence related to the uncharged shooting of Caleb Anderson, which occurred approximately 10 minutes before and 5 blocks away from Walton's shooting. For support, the State noted that an eyewitness to each shooting identified defendant, that a similarly described car was present for both shootings, and that forensic evidence showed that the same gun fired shell casings left at both scenes.

¶ 6     The defense filed a response, contending that there was insufficient evidence tying defendant to the Anderson shooting due to certain discrepancies in the eyewitness accounts and because the two shootings were too different to be probative of *modus operandi*. The defense attached police reports showing that the two other witnesses to the Anderson shooting, Anderson

---

[1] Defendant points out in his brief on appeal that his last name is actually spelled "Foremin." However, to maintain consistency with the other proceedings, we will use "Foreman."

himself and Derrick Mosley, did not identify defendant. Those reports indicate that aside from initially describing the suspect as a 19-or-20-year-old black man with a hat, Anderson did not cooperate with the police and signed a refusal to prosecute form. Also according to the reports, Mosley told a responding officer that the shooting involved a conflict between the "Deuce" Gangster Disciples (to which he and Anderson belonged) and the "Trey" Black Disciples. Mosley claimed that the suspects were "the same guys" who had shot at him and Anderson from a gray SUV several days prior. Mosley stated that the person who shot Anderson was a black male with dreads and a "light complexion" who he knew as "PB." The "other guy" was a 5'10" black male with a darker complexion who he knew as "Dawan." Mosley claimed that both PB and Dawan were from Iowa and had returned there after Anderson's shooting.

¶ 7    The trial court granted the State's motion following a hearing on September 28, 2016. Defendant filed a motion to reconsider, which was denied.

¶ 8                              B. *Voir Dire*

¶ 9    *Voir Dire* began on April 23, 2018. At the beginning of *voir dire*, the court informed the panel that "[u]nder the law the defendant is presumed to be innocent of the charge against him and this presumption remains with him throughout the stage of the trial and during your deliberations on a verdict." The court also explained that the presumption of innocence is overcome only if the State proves the defendant guilty beyond a reasonable doubt, that the defendant "is not required to present any evidence on his own behalf," and that "[i]f the defendant chooses not to testify, that fact cannot be held against him."

¶ 10    Shortly later in *voir dire*, the court again explained the following principles of law to the panel: (1) "that a person accused of a crime is presumed to be innocent of the charges against him," (2) "that the presumption of innocence stays with the defendant throughout the trial and is not

overcome unless from all the evidence you believe the State proved his guilt beyond a reasonable doubt," (3) "that the State bears the burden of proving the defendant's guilt beyond a reasonable doubt," (4) "that the defendant does not have to present any evidence on his own behalf and he may rely on his presumption of innocence," and (5) that "if the defendant chooses not to testify that fact cannot be held against him." The court asked the panel whether they understood and accepted each principle, and none of the potential jurors indicated that they did not.

¶ 11                                    C. Trial

¶ 12    The case proceeded to trial on April 26, 2018. Before the State introduced its evidence of the Anderson shooting, the trial court admonished the jury that:

> "This evidence will be received on the issue of the defendant's identification and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of the defendant's identification."

Then, Lafayette Ayers testified that just after 1 p.m. on May 29, 2013, he was talking to Anderson and Mosley in the street outside his home in the 12000 block of South Carpenter Street in Chicago. A "little gray" or silver car drove northbound on Carpenter and slowed down as it reached a speed bump in front of Ayers' house. Ayers was nearest to the driver's side of the car and could see that there were three occupants, two in the front seat and one behind the driver. When the car went over the speed bump, the back passenger "leaned up" in his seat and stuck his arm out of the window holding a gun. Ayers heard a gunshot and took cover. As he ran away, he heard a second set of gunshots that were different and "much louder" than the first. The car then drove away, turning right at the end of the road to travel eastbound on 122nd Street.

¶ 13    Ayers testified that the shooter in the back seat was "close enough [that he] could have snatched that gun out of his hand." It was daytime, and Ayers had an unobstructed view of the shooter's face. Because of his work as an armed security guard, Ayers was familiar enough with firearms to recognize the first shooter's gun as a .22 caliber.

¶ 14    On July 2, 2013, Ayers met with detectives to view a photo array. After signing an advisory form, Ayers identified defendant as the first shooter. On August 10, 2013, Ayers did the same in a physical line-up. He also identified defendant as the shooter in open court.

¶ 15    On cross-examination, Ayers testified that the driver of the gray or silver car was "a guy with dreads." He denied telling detectives that the driver was a woman, explaining instead that the woman was the front passenger. Ayers also agreed that he was "looking at the gun" as the car drove by, but stated that someone pointing a gun at him was a common occurrence in his line of work.

¶ 16    Choyce Dickerson, Walton' longtime girlfriend, testified as an eyewitness to Walton's shooting. She stated that on May 29, 2013, Walton called her and asked her to bring some money he had left at home to the corner of West 122nd Street and South Emerald Avenue in Chicago. Dickerson met Walton at that location, and they decided to go to a nearby convenience store located less than a block away on South Halsted Street. Dickerson drove to the store while Walton walked. As Dickerson waited in the store's drive-through, Walton stood outside the car and spoke to her through the passenger's side window. Then, Dickerson heard the "pop" of her passenger's side mirror shattering. Thinking that Walton must have done something to break the mirror, Dickerson turned her attention in that direction. Upon doing so, she saw Walton fall to the ground. Standing behind him was man holding a black gun with two hands. The man shot Walton two more times before running behind a fence that was behind Dickerson's car. Through gaps between

the fence panels, Dickerson observed a silver car speed away from the scene. She called 9-1-1 after the shooter fled.

¶ 17    Dickerson testified that the gunman, whom she identified in open court as defendant, was an approximately 5'7" black man with a short haircut and a "caramel" complexion. He was "[a]bout arm's length" away from her car when he shot Walton and nothing obscured her view of his face. It was just after 1 p.m. and "bright" outside.

¶ 18    Dickerson spoke to detectives the day after the shooting and then again on June 17, 2013. Dickerson viewed a photo array on that date, but was unable to identify a suspect. She next spoke to detectives on July 1, 2013 and, after signing a photo array advisory form, identified defendant as the shooter. She also identified defendant from a physical line-up at the police station on August 9, 2013.

¶ 19    On cross-examination, Dickerson stated that she told detectives about the silver car, but did not mention it in her grand jury testimony because she was not asked about it. She was unable to describe the shooter's gun in detail because she was "not familiar with guns." She denied telling detectives that the gun was either an Uzi or MAC-10, and did not know what those types of guns were. Finally, Dickerson acknowledged that surveillance footage from the convenience store showed there were actually two gunmen, but she only saw one gunman at the time of the incident and did not learn about the other until she viewed the video for the first time in October 2017.

¶ 20    Chicago police sergeant Isaac Lambert and detective Christopher Tenton testified that they were the detectives assigned to the case in May 2013. Both confirmed that they first spoke to Dickerson on the day after the shootings, and then showed her a photo array on June 17, 2013. Defendant's photograph was not included in the array and Dickerson did not identify a suspect. According to Lambert, Dickerson described the shooter's weapon as a "black Uzi or a MAC-10

style gun." After speaking to Dickerson again on July 1, 2013, Lambert assembled another array from which Dickerson identified defendant as the shooter. Both Ayers and Dickerson later identified defendant from separate physical lineups conducted on August 9, 2013. Tenton testified that both witnesses made their identifications "[i]mmediately" upon viewing the lineup.

¶ 21    Marc Pomerance, a forensic scientist for the Illinois State Police, was qualified as an expert in the field of firearms and toolmark examination without objection. He explained that toolmark identification involves using a microscope to examine a fired bullet or shell casing to determine whether it was fired from a particular gun. The process requires the examiner to consider both class characteristics—things like caliber and the number and twist direction of lands and grooves— and individual characteristics—traits specific to a particular firearm due to "microscopic irregularities and imperfections on the surface of an object that make one object unique and distinguishable from all others of a certain type."

¶ 22    Pomerance testified that he received five .45-caliber fired shell casings that were recovered from the scene of Walton's shooting as well as three .45-caliber fired shell casings and two .22-caliber shell casings recovered from the scene of Anderson's shooting. Pomerance observed that the .45-caliber casings from the Walton shooting all had a "hemispherical-shaped firing pin impression" and similar "smooth and parallel" breech face marks. After further microscopic examination utilizing "practices and procedures commonly accepted in the field of firearms identification," Pomerance concluded that those five casings were all fired from the same gun. He then compared the three .45-caliber casings from the Anderson shooting and determined that they were also all fired from the same gun used to fire the casings found at the Walton shooting. Finally, Pomerance concluded that the two .22-caliber casings were fired from the same gun as one another, but a different gun than the one that fired the .45-caliber casings.

¶ 23 The State also presented stipulations that the shell casings and other physical evidence from the Walton shooting were tested for fingerprints and DNA, but there were insufficient samples to produce a profile for comparison.

¶ 24 The State rested, and the defense moved for a directed verdict, which was denied.

¶ 25 The defense then proceeded by way of stipulation. First, the parties stipulated that retired Chicago police detective William Galvan would testify that on May 30, 2013, Ayers told him that the driver of the gray or silver car was a "black female with braids." Second, the parties stipulated that Lambert would testify that Dickerson told him on May 30, 2013, that she observed the shooter run into an alley behind her car, but did not mention that she saw the shooter get into a vehicle.

¶ 26 Defendant did not testify, and the defense rested without presenting any live witnesses.

¶ 27 D. Jury Instructions and Questions

¶ 28 After closing arguments, the trial court instructed the jury, in relevant part, as follows: (1) that the other crimes evidence must be considered only for the limited purpose of defendant's identity, (2) that defendant is presumed innocent unless and until the jury finds that the State proved his guilt beyond a reasonable doubt, (3) that defendant "is not required to prove his innocence" or to disprove any allegation, and (4) that "[t]he fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

¶ 29 During deliberations, the jury sent the trial court a note containing two written questions. First, the jury asked, "What were the leads to place the [defendant] in a line up/photo line up?" Second, and more relevant to the arguments on appeal, the jury asked, "Can the Defen[s]e share if there was a presumed alibi?" In a hearing with counsel for both parties, the court stated that the jury was not asking about a point of law and therefore suggested informing the jury that they have heard all the evidence and should continue deliberations. Both defense counsel and the State agreed

with the court's suggestion. Accordingly, the court responded to the jury, "You have heard the evidence. Please continue to deliberate." After further deliberations, the jury found defendant guilty of first degree murder.

¶ 30                                    E. Motion for New Trial

¶ 31     Defendant filed a motion for a new trial, arguing that (1) the State failed to prove his guilt beyond a reasonable doubt where Dickerson and Ayers were impeached and not credible and (2) the court erred in admitting the other crimes evidence where "[t]he State did not meet the first requirement of making a showing that [he] actually committed the other crime which it was seeking to introduce at trial." The court denied the motion after a hearing, and later sentenced defendant to a total of 60 years in prison. This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33                           A. Admission of Other Crimes Evidence

¶ 34                    1. Defendant's Connection to the Anderson Shooting

¶ 35     On appeal, defendant first argues that the trial court erred in admitting the other crimes evidence of the Anderson shooting. Specifically, defendant contends that the State failed to sufficiently prove that he was involved in the Anderson shooting where there was a lack of physical evidence and Ayers gave an unreliable identification. We disagree.

¶ 36     Evidence of other crimes is generally inadmissible where it is relevant only to prove a defendant's criminal propensity. *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). The rationale behind this rule is that such evidence might cause the jury to convict a defendant solely because it feels that he is a bad person deserving of punishment. *Id.* However, other crimes evidence may be admissible if relevant for any other purpose, such as to prove *modus operandi*, intent, identity, motive, or lack of mistake. *Id.* at 62-63. Before the State can present other crimes evidence, it must

show both that a crime occurred and that the defendant participated in its commission. *People v. Nash*, 2013 IL App (1st) 113366, ¶ 20. The State's evidence need not rise to the level of beyond a reasonable doubt, but must be "more than a mere suspicion." *Id.* Additionally, the trial court must weigh the probative value and the prejudicial effect of the other crimes evidence and exclude the evidence if it is substantially more prejudicial than probative. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). The ultimate decision on the admissibility of other crimes evidence rests within the sound discretion of the trial court, and the court's decision on the matter will not be disturbed on appeal absent a clear abuse of that discretion. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). A trial court abuses its discretion when its ruling is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court." *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 84.

¶ 37    Here, we find that the State provided more than a mere suspicion that defendant was involved in the Anderson shooting. Ayers, an eyewitness to the shooting, identified defendant as the shooter on three separate occasions: at a photo array, a physical lineup, and in open court . See *People v. Harris*, 2018 IL 121932, ¶ 27 (a positive and credible identification from a single eyewitness is sufficient to sustain a conviction beyond a reasonable doubt). Nevertheless, much of defendant's argument as to why his involvement in the Anderson shooting was not proven above a mere suspicion focuses on his contention that Ayers' identification was unreliable under the factors set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). Although the *Biggers* factors are typically used to determine whether an eyewitness identification was sufficiently reliable to sustain a conviction, the same factors also apply in the other crimes context. *Thompson*, 2020 IL App (1st) 171265, ¶ 89. Those factors for a court to consider in assessing the reliability of an eyewitness identification are: (1) the witness's opportunity to view

the offender during the offense, (2) the witness's degree of attention to the offender, (3) the accuracy of the witness's description of the offender, (4) the witness's level of certainty in the identification, and (5) the length of time between the offense and the identification. *Id.* ¶ 42.

¶ 38    On balance, we find that the *Biggers* factors support the reliability of Ayer's identification. First, Ayers testified that as the offenders drove down his street and slowed for a speed bump in front of his house, he had an unobstructed view of defendant's face in broad daylight. Ayers was also able to recognize that defendant had a .22-caliber firearm and that the second shooter had a different kind of firearm, which was corroborated by both .22 and .45-caliber shell casings being found at the scene. Although Ayers gave only a general description of defendant after the shooting, we find the description to be generally accurate and note that Ayers subsequently and consistently identified defendant on multiple occasions. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 51-52 (identification reliable where the eyewitness positively identified the defendant despite only being able to describe race and clothing after the offense). Tenton testified that Ayers identified defendant "immediately" during the lineup, and nothing in the record suggests Ayers ever wavered in his identification. Finally, we find that the approximately one-month gap between the offense and Ayers' first identification does not significantly weigh in favor of unreliability. Indeed, this court has often found identifications reliable despite longer delays. See, *e.g.*, *People v. Corral*, 2019 IL App (1st) 171501, ¶ 81 (45-day gap); *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (3-month gap); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (16- month gap). Consequently, we conclude that the *Biggers* factors support the trial court's ruling.

¶ 39    Aside from the *Biggers* factors, defendant also cites the suggestiveness of the identification procedures in arguing that Ayers' identification was unreliable. In particular, defendant notes that while the photo array and lineup that Ayers viewed contained only four "fillers," section 107A-2

of the Code of Criminal Procedure of 1963 (725 ILCS 5/107A-2 (West 2020)) now requires a lineup to contain at least five fillers. Defendant also asserts that detectives used an old photograph of him, filled the physical lineup with people who looked "grossly dissimilar" from him, and did not conduct the procedures in a "double blind" fashion because they were likely aware who Dickerson had previously identified as a suspect.

¶ 40     The State responds that defendant has waived any argument regarding the suggestiveness of the identification procedures by not filing a pretrial motion to suppress. However, while the lack of a motion to suppress may prohibit a defendant from challenging the admissibility of an identification (*People v. Brooks*, 187 Ill. 2d 91, 125-26 (1999)), it "d[oes] not preclude him from challenging the reliability of those identification and thus the overall sufficiency of the proof against him at trial." *In re T.B.*, 2020 IL App (1st) 191041, ¶ 41. With that said, we still see no basis in the record before us to conclude that the identification procedures used in this case were unduly suggestive. For instance, as defendant concedes, section 107A-2 did not take effect until January 2015, and thus it "does not inform our review." *Corral*, 2019 IL App (1st) 171501, ¶ 96. Additionally, even if we were to find the procedures overly suggestive, we would still find Ayers' testimony reliable. Where a defendant establishes a pretrial identification involved impermissibly suggestive procedures, a court may nevertheless allow the identification if, after considering the *Biggers* factors and the totality of the circumstances, there is clear and convincing evidence that the witness identified defendant solely on the basis of his memory of the offense. *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 21. Given Ayers' opportunity to view defendant's face from close range and in good lighting, as well as the unequivocal nature of his testimony, it is clear that Ayers' identification was based on his independent recollection.

¶ 41    We are also unpersuaded by defendant's other arguments as to why the State did not prove his involvement in the Anderson shooting above a mere suspicion. Although defendant repeatedly emphasizes that he was never charged for that shooting, we find this to be of limited significance since Illinois courts have upheld the admission of other crimes evidence "regardless of any conviction or charges relating to the offenses in the other-crimes evidence." *People v. Arze*, 2016 IL App (1st) 131959, ¶ 101. Additionally, defendant notes that Ayers was the only one of the three witnesses to the Anderson shooting to identify him as the shooter. However, it was the trial court's role to weigh the effect of the conflicting witness accounts. We cannot say that the court abused its discretion in this regard, especially where Anderson refused to cooperate with police and the record contains no testimony as to why Mosley believed the shooters were people other than defendant.

¶ 42    Accordingly, we find that the trial court did not abuse its discretion in determining that the State sufficiently connected defendant to the Anderson shooting.

¶ 43                    2. Probative Value vs. Prejudicial Effect

¶ 44    We now turn to defendant's argument that, regardless of the reliability of Ayers' testimony, the other crimes evidence failed to meet a "threshold requirement of similarity" to the charged offense, and was therefore substantially more prejudicial than probative.

¶ 45    As previous noted, a trial court presented with other crimes evidence must weigh its probative value and prejudicial effect. *Illgen*, 145 Ill. 2d at 365. Generally, the probative value of other crimes evidence becomes greater as the factual similarities between the other crime and the charged crime increase. *People v. Wilson*, 214 Ill. 2d 127, 142 (2005). Thus, Illinois courts have described some level of similarity as a "threshold" requirement for the admissibility of other crimes evidence. See, *e.g.*, *id.* at 136. The degree of similarity required varies depending on the

purpose for which the other crimes evidence is offered. Where the State seeks to prove a defendant's *modus operandi*, it must show strong and persuasive similarities. *Id.* at 140. However, where, as here, the State seeks to introduce other crimes evidence for a purpose other than *modus operandi*, a lesser degree of similarity is required. *Id.* at 141. In such cases, "general areas of similarity will suffice [.]" *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 36.

¶ 46    Here, there are ample similarities between the Anderson shooting and the Walton shooting. Both shootings occurred within approximately 10 minutes and 5 blocks of one another. There was also evidence that the offenders arrived unexpectedly in a light-colored vehicle and fled in that same vehicle after the incident. Moreover, there were two gunmen in each instance, and at least the very same .45-caliber firearm was used in both shootings. We find this more than sufficient to meet the "general" similarities required for admissibility. Furthermore, we note that the trial court properly instructed the jury that the other crimes evidence was relevant only to prove defendant's identity with respect to the Walton shooting. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 31 (an instruction on the limited purpose of other crimes evidence "substantially reduces any prejudicial effect created by the admission of the evidence"). Under these circumstances, the trial court did not abuse its discretion in admitting the other crimes evidence.

¶ 47                            B. Sufficiency of the Evidence

¶ 48    Defendant next argues that he was not proven guilty of the Walton shooting beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence against him, a reviewing court must determine whether, viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. It is the jury's responsibility to weigh, resolve conflicts in, and draw reasonable inferences from the evidence, and this court will not retry

the defendant by substituting its judgment on the these matters for that of the jury. *Id.* Instead, we will reverse a conviction on appeal only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.*

¶ 49    It is well-established that the positive and credible testimony of a single witness is sufficient to sustain a conviction. *Id.* ¶ 36. On appeal, defendant primarily attacks Dickerson's identification as unreliable, which again requires us to examine her testimony through the lens of the Biggers factors. As previously explained, those factors are: (1) the witness's opportunity to view the offender, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the offender, (4) the witness's level of certainty, and (5) the length of time between the offense and the identification. *Thompson*, 2020 IL App (1st) 171265, ¶ 84. No single *Biggers* factor conclusively establishes whether an identification was reliable; we must examine the factors as a whole in the context of the totality of the circumstances. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22.

¶ 50    Many of defendant's arguments regarding Dickerson's testimony are similar to those he made with respect to Ayers' testimony, and we disagree with them for similar reasons. For example, defendant contends that Dickerson had a poor opportunity to view the offender because her car "likely created an interference to her ability to see the shooter's face[.]" However, Dickerson's unrebutted testimony was that she was able to view defendant's face in the middle of the day for several seconds as he was just an arm's length away. The record also suggests that Dickerson's degree of attention was high, as she stated that she specifically focused toward where Walton had been standing when she heard her side mirror shatter. As to the third *Biggers* factor, Dickerson, like Ayers, gave a somewhat generalized but largely accurate description of defendant, describing him as a black male about 5'7" with a short haircut and a "caramel" complexion. Also

like Ayers, Dickerson consistently and unwaveringly identified defendant thereafter. She also declined to identify a suspect when shown a photo array that did not contain defendant's photograph. Finally, as examined above with respect to Ayers' testimony, neither the identification procedures nor the length of time between the first identification and the offense compel a conclusion that Dickerson's identification was unreliable. Thus, the totality of the *Biggers* factors suggest that Dickesron was reliable.

¶ 51    Nor are we troubled by the various minor discrepancies raised by defendant. It was the jury's role to resolve any conflicts in the evidence, and minor inconsistencies in the testimony may affect the weight of the testimony but do not necessarily create reasonable doubt. *Corral*, 2019 IL App (1st) 171501, ¶ 85. Additionally, the "inconsistencies" identified by defendant are all capable of being reasonably resolved in the State's favor. For example, defendant notes that (1) Ayers testified that defendant's car turned eastbound onto 122nd Street, but a vehicle seen on the surveillance video enters the area of Walton's shooting going westbound on 122nd; (2) Ayers testified that defendant had a .22, but Walton was shot with a .45; (3) Ayers testified that defendant wore a hat during the Anderson shooting, but Dickerson did not mention a hat during the Walton shooting; and (4) the State presented no motive or physical evidence other than the ballistic findings. However, viewing the evidence in the light most favorable to the State, the jury could have easily concluded that defendant's car either turned around or was not the same one on the video, that defendant switched guns between shootings (especially where the same .45-caliber firearm was used in both shootings), and that defendant simply removed his hat between shootings. Moreover, while the State did present firearms evidence connecting the two shootings, a conviction does not require physical evidence (*People v. Herron*, 2012 IL App (1st) 090663, ¶ 23) or a proven

motive (*People v. Cerda*, 2021 IL App (1st) 171433, ¶ 109). In sum, we find that a reasonable jury could have relied on Dickerson's testimony in finding defendant guilty beyond a reasonable doubt.

¶ 52                    C. Response to the Jury's Question

¶ 53    Finally, defendant argues that we should reverse his conviction and remand for a new trial where the jury did not honor the legal principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, defendant contends that by asking whether he had an alibi for the time of the shootings, the jury "clearly establish[ed] that they were considering [his] failure to testify or present any evidence." He further maintains that the trial court abused its discretion by failing to inquire into potential juror bias or confusion surrounding the presumption of innocence.

¶ 54    At the outset, defendant concedes that he failed to preserve the issue by neither objecting in the trial court nor raising the matter in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both a contemporaneous objection and a posttrial motion raising the matter are required to preserve an issue for appeal). Accordingly, defendant asks us to consider his argument under the plain error doctrine, which allows a reviewing court to consider a forfeited issue where the defendant can show that a clear error occurred and that either the evidence was closely balanced or the error was significant enough to implicate the fairness of the defendant's trial and the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 55    However, as the State points out, defense counsel did more than simply fail to preserve this issue—counsel affirmatively acquiesced to the alleged error by agreeing with the trial court's proposed response to the jury. Normally, a party who acquiesces to the manner in which a trial court proceeds affirmatively waives the ability to later claim on appeal that the trial court erred. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 73. One exception to this general waiver rule involves structural errors, which, whether invited or not, must be "automatically reversed" in order to

protect the integrity of the judicial process. *People v. Lewis*, 2019 IL App (4th) 150637-B ¶ 86.

Defendant argues that the error in this case rose to the level of a structural error because the jury's

questions revealed a clear instance of jury bias. However, for reasons we will explain, we conclude

that the trial court did not err, and thus no structural error occurred. *Id.* ¶ 87. By that same token,

we also find that defendant is not entitled to relief under the plain error doctrine or as a matter of

ineffective assistance based on counsel's failure to preserve the issue. See *People v. Lopez*, 2012

IL App (1st) 101395, ¶ 64 ("If there was no error in the first instance, there can be no plain error.").

¶ 56     First, this court will not presume that a jury was biased, and it is the defendant who bears

the burden of persuasion on the issue. *People v. Peters*, 2011 IL App (1st) 092839, ¶ 40. Here,

defendant's only evidence of potential bias is the question itself. However, we are not persuaded

that the jury's question alone showed that defendant's failure to testify was a factor in the verdict.

This is especially so because the jury was properly instructed, on multiple occasions throughout

the proceedings, that defendant was presumed innocent and was not required to testify or present

other evidence. All of the jurors in this case indicated that they understood and accepted these

principles. Put simply, we see no reason to presume that the jury did not follow the court's

admonishments once they were informed that there would be no alibi evidence. See *People v.

Green*, 2017 IL App (1st) 152513, ¶ 98 (jury is presumed to follow the trial court's instructions

absent a showing to the contrary).

¶ 57     Second, we find that the trial court's response to the jury's questions was appropriate.

Evaluating a trial court's handling of a jury question involves a two-step analysis. First, we must

determine whether the court should have answered the question at all. *People v. Leach*, 2011 IL

App (1st) 090339, ¶ 16. The decision on whether to answer a jury's question is within the sound

discretion of the trial court. *Id.* Second, if the court chooses to provide an answer, we must then

decide whether the court's response was accurate. *Id.* That determination is a question of law which we review *de novo*.

¶ 58    Generally, a trial court has a duty to answer a jury's questions where the jurors are "manifestly confused" or ask for clarification on a point of law. *People v. Ware*, 2019 IL App (1st) 160989, ¶ 18. However, a court may decline to answer a question where it involves a question of fact or where the instructions already given are readily understandable and sufficiently explain the relevant law. *Id.* ¶ 19. In this case, the jury's question as to whether defendant could provide an alibi was squarely a question of fact, *i.e.*, it was an inquiry into what evidence was available for them to consider. As such, it was within the trial court's discretion to not provide an answer. The court's response that the jury had heard all the evidence and should continue deliberating was also concise, easily understandable, and accurate. See *People v. Adams*, 404 Ill. App. 3d 405, 419 (2010) (describing "You have heard the evidence. Please continue deliberating." as the "traditional response" when declining to answer a jury question involving a question of fact). Additionally, the instructions in this case were complete and clear as to what the evidence was and what the jury could and could not consider against defendant. Accordingly, we find no error in the trial court's handling of the jury's questions.

¶ 59                            III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court.

¶ 61    Affirmed.